25CA1734 Peo in Interest of SH 04-23-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1734
Mesa County District Court No. 23JV62
Honorable Matthew D. Barrett, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of S.H., E.H., A.H., and V.H., Children,

and Concerning S.K.,

Appellant.

---

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHUTZ
Freyre and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 23, 2026

---

Todd M. Starr, County Attorney, John R. Rhoads, Assistant County Attorney, Grand Junction, Colorado, for Appellee

Josie L. Burt, Counsel for Youth, Glenwood Springs, Colorado, for S.H.

Jenna L. Mazzucca, Guardian Ad Litem for E.H., A.H., and V.H.

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver Colorado, for Appellant

¶ 1     S.K. (mother) appeals the judgment terminating her parent-child legal relationships with S.H., E.H., A.H., and V.H. (the children).  We affirm.

## I.     Background

¶ 2     In August 2022, the Mesa County Department of Human Services initiated a dependency or neglect action, alleging that mother struggled with issues of mental health, substance abuse, domestic violence, and homelessness.  The Department removed the children, but after mother agreed to stay at a family shelter and enter into a deferred adjudication agreement, the Department returned the children to her care.  In May 2023, the juvenile court dismissed the case at the Department's request.

¶ 3     After the initial dependency or neglect case closed, the Department continued to provide the family with services, which they could access on a voluntary basis.  Less than two months later, mother was contacted by law enforcement and placed on a mental health hold after an incident in which she believed the family was in danger, ran into the street with the children, and brandished a machete.  The Department removed the children again and filed a new petition in dependency or neglect.

1

¶ 4     Mother denied the allegations in the petition and asked for a jury trial.  After trial, the jury determined that the Department had proven the allegations, and the juvenile court sustained the petition and adjudicated the children dependent or neglected.

¶ 5     The juvenile court then held a dispositional hearing and adopted a treatment plan for mother that required, among other things, that she complete a psychological evaluation and specialized family assessment, participate in therapeutic parenting time and a parenting class, engage in life skills training, and maintain stable housing and employment.

¶ 6     In June 2024, the Department moved to terminate mother's parental rights.  The juvenile court held an evidentiary hearing over six days in July 2025.  After hearing the evidence, the court determined that, although mother had participated in some of the services provided by the Department, she continued to struggle with the same issues that prompted the dependency or neglect cases. The court then determined that an allocation of parental responsibilities (APR) to either D.M. (maternal grandmother) or S.H. (maternal aunt) was not a less drastic alternative to termination.

As a result, the court terminated the parent-child legal relationship between mother and the children.

## II. In Camera Interview

¶ 7 Mother asserts that the juvenile court violated her due process right to confrontation and cross-examination when it conducted an in camera interview of her child, E.H. In the alternative, she maintains that, even if she did not have a constitutional right to confront and cross-examine E.H., the court abused its discretion by allowing the in camera interview. As explained below, mother failed to preserve her contention for appellate review, so we decline to address it for the first time on appeal.

¶ 8 Because dependency or neglect cases are civil in nature, "appellate courts [generally] review only issues presented to and ruled on by the lower court." *People in Interest of M.B.*, 2020 COA 13, ¶ 14. To preserve a claim for appellate review, a party must make an objection that is specific enough to alert the court to the asserted error. *People v. Tallent*, 2021 CO 68, ¶ 12. "[M]erely calling an issue or fact to the court's attention, without asking for any relief, is insufficient to preserve an issue for review." *Forgette v. People*, 2023 CO 4, ¶ 23.

¶ 9     In this case, the guardian ad litem (GAL) reported to the juvenile court that E.H. wanted to testify.  But the GAL did not believe that it would be in E.H.'s best interests to do so in open court, so the GAL asked the court to conduct an in camera interview of E.H.  *See People in Interest of H.K.W.*, 2017 COA 70, ¶ 17 (concluding that section 19-1-106, C.R.S. 2025, permits juvenile courts to conduct in camera interviews of children in dependency or neglect cases).

¶ 10    When the court asked for mother's position, her attorney stated the following:

> Here's the struggle.  It's — I agree that that putting [E.H.] on the stand and having him have to testify in front of all of us could potentially be very detrimental.  And that's something that, you know, we are weighing in balancing with [mother's] constitutional rights, due process rights, all those things in a termination hearing.

The juvenile court then interjected with the following:

> [B]efore we get much further, the question I'm going to pose to you is: this is about the best interest of the child.  This is not a criminal case.  So I don't want there to be some confusion between what the rights look like across these different types of cases.  And you're going to have to at least explain to me why it's — the best interests of [E.H.] are

4

served by requiring him to testify, and be subject to cross examination through mother's counsel, about things that he doesn't want to share with everyone here. And how those best interests are trumped by that ability to cross examine[.]

Mother's counsel said that she agreed with the court and that was why she was requesting the opportunity to "give the [c]ourt any questions that the parties may feel [are] appropriate to ask him." *See People in Interest of S.L.*, 2017 COA 160, ¶¶ 48-49 ("[I]n the interests of fairness and to allow for the development of a full record, the trial court should allow the parents or trial counsel to submit questions to the child, which the court may ask in its discretion.").

¶ 11 Based on this exchange, we conclude that mother failed to preserve her argument for purposes of appeal. Mother contends that she objected to the in camera interview and only agreed to it after the court denied her request. But mother's counsel never made any specific objection to the in camera interview. *See Tallent,* ¶ 12. Nor did she assert that mother had a constitutional right to confront witnesses through cross-examination that would be violated by the in camera interview. Rather, she only noted her

5

concern about the balancing of the child's best interests with mother's constitutional rights. *See Forgette*, ¶ 23. And she ultimately agreed with the court that an in camera interview was appropriate in this case.

¶ 12 Because mother failed to object to an in camera interview on either ground that she raises on appeal, we decline to address the merits of her argument. *See M.B.*, ¶ 14.

### III. Termination of Parental Rights

¶ 13 Mother next contends that the juvenile court erred by terminating her parental rights. We are not persuaded.

### A. Termination Criteria and Standard of Review

¶ 14 Under section 19-3-604(1)(c), C.R.S. 2025, the juvenile court may terminate parental rights if it finds, by clear and convincing evidence, that (1) the child has been adjudicated dependent or neglected; (2) the parent has not reasonably complied with an appropriate treatment plan or the plan has not been successful; (3) the parent is unfit; and (4) the parent's conduct or condition is unlikely to change within a reasonable time.

¶ 15 Whether a juvenile court properly terminated parental rights presents a mixed question of law and fact because it involves

6

application of the termination statute to evidentiary facts. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶ 15. We review the court's factual findings for clear error, but we review de novo its legal conclusions based on those facts. *People in Interest of S.R.N.J-S.*, 2020 COA 12, ¶ 10.

¶ 16 The credibility of the witnesses; sufficiency, probative value, and weight of the evidence; and the inferences and conclusions drawn therefrom are within the juvenile court's discretion. *People in Interest of A.J.L.*, 243 P.3d 244, 249-50 (Colo. 2010). We therefore cannot reweigh the evidence or substitute our judgment for that of the juvenile court. *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 29.

### B. Appropriate Treatment Plan

¶ 17 Mother argues that the juvenile court erred by determining that her treatment plan was appropriate. We disagree.

¶ 18 A treatment plan is appropriate if it is (1) reasonably calculated to render the parent fit to provide adequate parenting to the child within a reasonable time and (2) relates to the child's needs. § 19-1-103(12), C.R.S. 2025. An appropriate treatment plan must "address the safety concerns identified during the assessment

of the family." *People in Interest of K.B.*, 2016 COA 21, ¶ 14. We measure the appropriateness of a treatment plan by its likelihood of success in reuniting the family, "which must be assessed in light of the facts existing at the time of the plan's approval." *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005).

¶ 19 The primary purpose of a treatment plan is "to reunite a parent and child in the kind of relationship [that] will be beneficial to both, under conditions [that] are designed to eliminate those factors [that] necessitated society's intrusion into the family in the first instance." *People in Interest of B.J.D.*, 626 P.2d 727, 730 (Colo. App. 1981). A plan must be designed to achieve this objective but do so in a way that is consistent with ensuring the health and welfare of the children. § 19-3-208(2)(a) C.R.S. 2025 ("'Services' shall be designed to . . . promote the immediate health, safety, and well-being of children eligible for these services based upon the case assessment and individual case plan[.]").

¶ 20 The juvenile court found that mother's treatment plan was appropriate and that it addressed the main concerns that brought the family to the Department's attention. The record supports the

8

court's finding. The first caseworker[1] testified that she developed the treatment plan based on what worked and did not work for the family during the first dependency or neglect case and the subsequent voluntary services. The caseworker said that mother's mental health presented differently in this case, and she therefore believed that the treatment plan needed to "delve[] deeper" into mother's underlying issues by including a psychological evaluation and therapeutic family time. Overall, the caseworker opined that the treatment plan was appropriate because it "was mindfully created in implementing services that would mitigate the concerns" and the reasons "why the Department got involved with this family again."

¶ 21    Mother contends that her treatment plan was inappropriate because she could not complete it, given her inability to access E.H.'s therapeutic information. We disagree for the following two reasons.

¶ 22    First, mother's challenge to the treatment plan is based on her contention that the juvenile court erred by allowing E.H. to hold his

---

[1] There were three different caseworkers assigned to this family. We refer to them in the chronological order that they served in the case.

own therapeutic privilege. *See L.A.N. v. L.M.B.*, 2013 CO 6, ¶ 27 (concluding that, "when neither the child nor the child's parent(s) have [the] authority" to hold the child's psychotherapist-patient privilege, then "the GAL should hold the child's privilege"). But mother never objected to E.H. holding his own therapeutic privilege. *See Tallent*, ¶ 12. Because mother failed to object in the juvenile court, we will not address for the first time on appeal her challenge to the court's decision to allow E.H. to hold his own privilege. *See M.B.*, ¶ 14.

¶ 23    Second, mother maintains that her treatment plan was inappropriate because she was prevented from "understanding [E.H.'s] needs and refusal to attend parenting time." But the record shows that mother received information about E.H.'s needs and his refusal to attend parenting time through multiple sources, such as family engagement meetings, meetings with the caseworkers, feedback from therapeutic family time supervisors, and professional reports. And even if mother had been allowed to access information from E.H.'s therapist, she does not explain with any specificity how she could have used that information to complete her treatment plan.

¶ 24    Mother next asserts that her treatment plan was inappropriate because it did not include a domestic violence component. The record indicates that mother had a history of domestic violence issues, but domestic violence was not one of the core concerns that necessitated the Department's intervention in this case. *See B.C.*, 122 P.3d at 1071. And although the treatment plan did not include a domestic violence component, it still provided for services — namely, individual therapy — that were intended to address mother's trauma history, including domestic violence. *See K.B.*, ¶ 23 (noting that, even though domestic violence was not explicitly addressed in the treatment plan, the department could have offered services to adequately address it). Therefore, we are not convinced that mother's treatment plan was inappropriate because it did not specifically address domestic violence.

¶ 25    Finally, mother asserts that, because her treatment plan was inappropriate, the Department had an obligation to request modification of it. *See People in Interest of Z.P.S.*, 2016 COA 20, ¶ 26 ("[C]hanged circumstances may render a treatment plan, previously approved at a dispositional hearing, no longer

11

appropriate."). But because we have concluded that the treatment plan was appropriate, mother's argument necessarily fails.

## C.    Reasonable Efforts

¶ 26    Mother asserts that the Department did not make reasonable efforts to rehabilitate her and reunify her with the children. We are not persuaded.

¶ 27    In determining fitness under section 19-3-604(1)(c), the juvenile court must consider whether the county department of human services made reasonable efforts to rehabilitate the parent and reunite the family. §§ 19-1-103(114), 19-3-208, 19-3-604(2)(h), C.R.S. 2025. "Reasonable efforts" is defined as the "exercise of diligence and care" to reunify parents with their children, and the department's reasonable efforts obligation is satisfied if it provides appropriate services in accordance with section 19-3-208. § 19-1-103(114).

¶ 28    When determined "necessary and appropriate," the department must provide (1) screening, assessments, and individual case plans; (2) home-based family and crisis counseling; (3) information and referral services; (4) family time; and (5) placement services. § 19-3-208(2)(b). The juvenile court should

12

consider whether the services provided were appropriate to support the parent's treatment plan, *People in Interest of S.N-V.*, 300 P.3d 911, 915 (Colo. App. 2011), by "considering the totality of the circumstances and accounting for all services and resources provided to a parent to ensure the completion of the entire treatment plan," *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 33.

¶ 29    The juvenile court found that the Department made reasonable efforts to rehabilitate mother and reunify her with the children. The record supports the court's findings. The caseworkers testified that the Department authorized services for mother to complete her treatment plan, including referrals for family time, a psychological evaluation, a specialized family assessment, and life skills. The caseworkers also testified that the Department provided the children with mentors, coaches, and individual therapy.

¶ 30    Nevertheless, mother presents arguments articulating why she believes that the Department failed to make reasonable efforts. We address these arguments in turn.

## 1. Housing

¶ 31    Mother asserts that the Department did not provide her with adequate housing resources because it only (1) gave her a vehicle and expected her to use it for shelter and (2) recommended that she apply for a voucher program with a long waitlist. We are not persuaded.

¶ 32    Recall that a department can meet its reasonable efforts obligation by providing appropriate services under section 19-3-208. *See* § 19-1-103(114). However, section 19-3-208 does not explicitly require the Department to provide housing resources. *See People in Interest of A.R.*, 2012 COA 195M, ¶ 28 (noting that, as compared to the active efforts standard, a department may be able to satisfy the reasonable efforts standard by passively "requiring a parent to . . . acquire new housing"). At most, section 19-3-208(2)(b)(III) requires the Department to provide "[i]nformation and referral services to available public and private assistance resources."

¶ 33    Because the record shows that the Department provided mother with information and referrals to housing resources, we reject her argument. The first caseworker testified that, in the first

14

dependency or neglect case, the Department arranged for the family to stay at a shelter and then assisted mother with applying for housing through the local authorities. The caseworker said that, during the second case, mother's application had expired, so she helped mother submit a new application. The record also shows that mother had a life skills worker, who helped her access information on employment and housing.

¶ 34    Contrary to mother's assertion, nothing in the record suggests that the Department expected mother to live in her car. Rather, the first caseworker's testimony indicated that, when mother asked for a car, she said that she wanted to use it "as a form of shelter and to keep warm." We see no evidence, and mother has not directed us to any, showing that the Department believed that providing mother with a car was enough to satisfy its reasonable efforts requirement to help with housing.

¶ 35    As for mother's assertion that the housing voucher program had a three-year waitlist, she has not directed us to any competent evidence in the record to support that contention. Rather, she points to unsworn statements from her own attorney, as well as secondhand statements within a report that was not admitted at

the termination hearing.  These statements are not evidence, and the juvenile court could not properly consider them at the termination hearing.  Therefore, we cannot consider them on appeal either.

## 2. Family Time

¶ 36 Mother contends that the Department failed to make reasonable efforts because it did not (1) provide her with "sufficient" parenting time; (2) ensure that E.H. attended family time; and (3) refer her to family therapy.  We disagree.

¶ 37 To satisfy the reasonable efforts requirement, a department must make available and provide "[f]amily time services for parents with children or youth in out-of-home placement."  § 19-3-208(2)(b)(IV).  Family time services must be provided "as determined necessary and appropriate by individual case plans."  § 19-3-208(2)(a)-(b).  A court may not restrict family time services unless it determines that family time would be detrimental to the child's health and safety.  § 19-3-217(3), C.R.S. 2025; *see also People in Interest of E.S.*, 2021 COA 79, ¶ 23.  Because the court must make decisions about family time, it cannot delegate its authority to do so to other parties.  *See B.C.*, 122 P.3d at 1070-71.

¶ 38 Mother first asserts that the Department did not provide her with "sufficient" parenting time because she had only one hour per week of therapeutic family time with each child, and even though she was making progress, her therapeutic supervisors never recommended any changes to her family time. In other words, she maintains that, because the family time services were insufficient to reunify her with the children, the Department failed to provide "adequate" family time services as required by section 19-3-208(2)(a)-(b). We are not persuaded.

¶ 39 Mother's treatment plan stated that she would have therapeutic family time with all four children, along with an additional hour and a half long supervised community visit every other week. Around February 2024, the Department agreed to transition all of mother's visits to regular supervised family time. However, the family time supervisor soon reported that the community visits had become chaotic and expressed concerns about the lack of therapeutic interventions.

¶ 40 In July 2024, the Department moved to restrict mother's family time to "one therapeutic visit per week with each child." The Department alleged, among other things, that mother could not

17

"maintain control of all four children during the visits" and that the children were becoming "dysregulated before, during, and after visits." Therefore, the Department maintained that individual visits with each child would "better support the building of the relationship between" mother and each child.

¶ 41 A magistrate held an evidentiary hearing over two days in July and August 2024. *See* § 19-3-217(3) (stating that "a parent granted family time is entitled to a hearing prior to an ongoing reduction in, suspension of, or increase in the level of supervision" of family time, unless there is agreement by the parties). After hearing the evidence, the magistrate determined that mother did not exhibit an awareness of the children's emotional well-being and therefore community visits were no longer safe for the children. The magistrate held a review hearing about a month later to determine whether the community visits should be reinstated, but after hearing from the therapeutic family time supervisors, the magistrate maintained its previous order.

¶ 42 Mother never challenged the magistrate's order restricting her parenting time. Nor did she file a motion before the termination hearing requesting that the juvenile court reinstate the previous

18

family time order or otherwise expand her family time. Instead, mother asserted at the termination hearing that the Department failed to make reasonable efforts because it did not exercise its discretion to expand her family time. *See* § 19-3-217(2) (allowing juvenile courts to grant discretion to the department "to increase opportunities for additional parent-child contacts or sibling contacts without further court order").

¶ 43    At the termination hearing, the evidence established that, although mother had made some recent progress during therapeutic visits, the family time supervisors did not recommend expanding visits or modifying the supervision level. For example, one supervisor testified that the children still do not emotionally trust mother and that the children were having trouble progressing during visits because the case had been opened for so long without any changes. The other therapeutic supervisor testified that mother could, at best, inconsistently provide for the children's emotional needs because of "her own emotional state."

¶ 44    Based on this evidence, the juvenile court found that the Department provided adequate family time services, noting that mother initially had family time with all the children but that those

visits were "too chaotic." The court also found that the Department attempted to "tailor the visits to facilitate maximum success," but family time had not "expanded" because of a lack of progress. The court was not persuaded by mother's assertion that the Department was to blame for the lack of progress, concluding instead that the "stagnation [was] due to the incredible harm [mother] ha[d] caused the children," including her inability to "meet the children's emotional needs."

¶ 45 The record therefore supports the juvenile court's finding that the Department provided mother with adequate family time in view of the existing circumstances, and we cannot reweigh the evidence or substitute our judgment to reach a different result. *See S.Z.S.*, ¶ 29. We therefore discern no basis to disturb the court's reasonable efforts finding with respect to the adequacy of family time. *See E.D.*, ¶ 46 (rejecting the parent's assertion that the Department failed to make reasonable efforts to expand family time because "[t]he record supports that limiting [the parent's] family time to a therapeutic setting was necessary for the youth's safety and mental, emotional, and physical health").

¶ 46    Next, mother contends that the Department failed to provide her with family time with E.H. because it allowed E.H, the foster parents, or the professionals to effectively veto family time. We agree with mother that the juvenile court alone has the authority to control decisions about family time and that other parties (e.g., therapists, caseworkers, foster parents, or children) do not have veto power over family time. *See B.C.*, 122 P.3d at 1070-71. We also disavow any notion that children should be saddled with the burden of deciding whether family time is appropriate or that they should be emboldened to reject family time.

¶ 47    That said, because the record in this case indicates that the Department and its providers made efforts to encourage E.H. to attend family time, we discern no error. For example, E.H.'s therapeutic family time supervisor testified that visits were scheduled and available each week, and she would speak with E.H. each time about attending the visit. She also said that she encouraged E.H. and mother to write letters to facilitate a conversation in hopes of restarting visits. And the caseworker made similar efforts by speaking with E.H. about attending family time and arranging for mother to write letters to encourage E.H.'s

21

attendance. Accordingly, based on this record, we cannot say that the Department failed to make reasonable efforts. *See E.D.*, ¶ 3 (holding that a department can make reasonable efforts by "providing appropriate therapeutic family time services . . . even if those services don't successfully result in face-to-face contact").

¶ 48 We also reject mother's contention that the Department did not make reasonable efforts because it declined to refer her to family therapy with her children. Notably, mother's treatment plan did not include any requirement that she engage in family therapy, and although mother's specialized family assessment recommended family therapy, it did so with respect to therapy between mother and maternal grandmother. Mother asserts that the Department still should have made a referral to family therapy because the therapeutic family time supervisor and providers in the first dependency or neglect case recommended it. But the first caseworker and the caseworker supervisor testified that they did not authorize family therapy for mother and the children because neither mother's therapist nor the children's therapists recommended it. *See My.K.M.*, ¶ 33 (allowing departments to

"prioritize certain services or resources to address a family's most pressing needs").

### 3. Other Miscellaneous Contentions

¶ 49 Mother raises five additional contentions, some with various subparts. We address them in turn.

¶ 50 First, mother argues that the "Department's errors inhibited [her] progress." Specifically, she takes issues with (1) the first caseworker's admitted bias against maternal grandmother; (2) the second caseworker's inappropriate communications to her; and (3) the Department's "mixed messages" about success. The juvenile court specifically addressed and rejected the first two points because the caseworkers' behavior had "no bearing" on mother's ability to successfully complete the treatment plan. Mother does not directly challenge this finding, and because it's supported by the record, we cannot second-guess it. *See S.Z.S.,* ¶ 29.

¶ 51 As to the Department's "mixed messages," mother provides two minor examples, and we are not convinced, given that mother's treatment plan provided concrete measurements of success, that any minimal confusion could result in a lack of reasonable efforts.

*See My.K.M.*, ¶ 35 (noting that the department's efforts "must be measured holistically rather than in isolation").

¶ 52     Second, mother asserts the Department did not make reasonable efforts when it did not provide her with information about the children's therapy or needs.  In support, mother notes that she was not allowed to attend (1) meetings between the professionals and (2) the Department's management team staffing sessions.  But mother met with the caseworkers on a regular basis, attended family engagement meetings, and received reports and feedback from the professionals.  Therefore, the Department provided mother with information about the children's needs, even though she was not allowed to attend every meeting.

¶ 53     Third, mother contends that the Department "failed to make efforts focused on reunification."  We see nothing in this section suggesting that the Department failed to provide the services required by section 19-3-208.  At best, mother asserts that the Department did not do enough to provide sibling visits.  *See* § 19-1-103 (defining family time as "any form of contact or engagement between . . . siblings . . . for the purposes of preserving and strengthening family ties").  But we are not convinced that the

Department failed to make reasonable efforts by not arranging more sibling visits, considering that the record shows — and the juvenile court found — that the children tended to "retraumatize each other" and therefore could not be placed together.

¶ 54 Fourth, mother maintains that the Department did not make efforts to support a kin placement. We are not persuaded because (1) the record shows that the Department did provide resources for the maternal grandparents while the children were in their care and (2) mother does not point us to any authority requiring the Department to provide additional resources to kin — especially when the children are not placed with kin — to satisfy its reasonable efforts obligation.

¶ 55 Finally, mother asserts that the juvenile court erred by delaying consideration of reasonable efforts until the termination hearing. We do not condone the practice of delaying consideration of reasonable efforts until the termination hearing because doing so could prevent the parent from addressing actual or perceived ongoing problems with the services provided. And although we acknowledge that the court's decision to delay resolution of the reasonable efforts issue in this case is problematic, we are not

persuaded that the result would have been different if the court held an earlier hearing.  We therefore discern no harm associated with the delay in resolving mother's reasonable efforts motion.

### D.    Fit Within a Reasonable Time

¶ 56    Mother contends that the juvenile court erred by finding that she could not become fit within a reasonable time.  We are not persuaded.

¶ 57    An unfit parent is one whose conduct or condition renders the parent unable or unwilling to give a child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental needs and conditions. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 58    In determining whether the parent can become fit within a reasonable time, a juvenile court may consider whether any change has occurred during the case, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition. *People in Interest of D.L.C.*, 70 P.3d 584, 588-89 (Colo. App. 2003). The determination of a reasonable period is fact-specific and varies

from case to case. *S.Z.S.*, ¶ 25. But a reasonable time is not an indefinite time, and it must be determined by considering the child's physical, mental, and emotional conditions and needs. *A.J.*, 143 P.3d at 1152.

¶ 59 The juvenile court determined that mother could not become fit within a reasonable time. In doing so, the court found that, although mother "engage[d] and participate[d] in various aspects of her treatment plan . . ., after two years of working on her plan, [she] still ha[d] many of the same problems that led to the opening of this case." The court noted that mother only recently began to "show a willingness to engage," which was consistent "with her previous efforts." Thus, considering the children's needs, the court determined that it was not in their best interests to allow mother more time to work on her treatment plan.

¶ 60 The record supports the juvenile court's findings. For example, the caseworker supervisor acknowledged that mother had started engaging more in therapy and family time over the last few months of the case, but she still opined that it was not in the children's best interests to give mother more time. In support, the supervisor noted that the Department had provided services to

mother for nearly three years, and during that time, mother had exhibited patterns of engagement followed by non-engagement. The third caseworker concurred with this opinion, noting that, despite mother's progress over the last few months, because of her history of "relapses," she could not become fit within a reasonable time.

¶ 61 Mother asserts that she could become fit within a reasonable time because she "demonstrated a substantial change" over the last few months of the case. As discussed above, the witnesses agreed that mother's engagement in the treatment plan improved in the months before the termination hearing. But even "increased compliance" over the course of a case may not justify additional time. *People in Interest of V.W.*, 958 P.2d 1132, 1134-35 (Colo. App. 1998). And in this case, the juvenile court explicitly considered mother's improved compliance and weighed it against the contrary evidence to reach its decision. *See In re Marriage of Kann*, 2017 COA 94, ¶ 36 ("[O]ur supreme court has . . . expressed unbridled confidence in trial courts to weigh conflicting evidence."). Under these circumstances, we must therefore reject mother's assertion because it would require us to reweigh the evidence, which we cannot do. *See S.Z.S.*, ¶ 29.

## E. Less Drastic Alternatives

¶ 62 Mother maintains that the juvenile court erred by finding that there was no less drastic alternative to termination. We disagree.

¶ 63 Before terminating parental rights under section 19-3-604(1)(c), the juvenile court must consider and eliminate less drastic alternatives. *People in Interest of M.M.*, 726 P.2d 1108, 1122 (Colo. 1986). In considering less drastic alternatives, a court must give primary consideration to the child's physical, mental, and emotional conditions and needs. § 19-3-604(3).

¶ 64 A viable less drastic alternative must do more than adequately meet a child's needs; rather, it must be in the child's best interests. *A.M.*, ¶ 27. Therefore, if the court considers a less drastic alternative but finds instead that termination is in the child's best interests, it must reject the less drastic alternative and order termination. *Id.* at ¶ 32. Under those circumstances, we must affirm the court's decision if its findings are supported by the record. *People in Interest of B.H.*, 2021 CO 39, ¶ 81.

¶ 65 The juvenile court determined that there was no less drastic alternative to termination. In doing so, the court considered whether an APR to maternal grandmother or maternal aunt would

be in the children's best interests: The court rejected an APR for the following reasons:

- In general, the evidence established that termination and adoption better served the needs of the children in contrast to a placement with maternal grandmother or aunt.

- Specifically, as to maternal grandmother, the court considered the history of domestic violence and police calls at maternal grandmother's home.

- As to maternal aunt, her limited knowledge of the children's significant needs counseled against placement with her. *See People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (an APR to a relative "is not a viable alternative to termination if the [relative] lacks appreciation . . . of the child's conditions or needs").

¶ 66 On appeal, mother does not directly challenge the juvenile court's findings, but she nevertheless asserts that the court erred by rejecting an APR to maternal grandmother or maternal aunt based on (1) the mental and emotional impact of termination on children generally; (2) the children's bond with the maternal

relatives and mother; and (3) the relatives' availability to accept an APR. Mother is correct that a juvenile court can consider these factors when deciding if there is a viable less drastic alternative to termination. *See, e.g., People in Interest of N.D.V.*, 224 P.3d 410, 421 (Colo. App. 2009). But they are just some of the relevant factors a court may consider. *See A.R.*, ¶ 38. And in this case, the court considered and rejected an APR based on the above stated findings, notwithstanding the competing considerations. Because the record supports the juvenile court's findings, we cannot disturb its resulting decision. *See B.H.*, ¶ 80; S.Z.S., ¶ 29.

¶ 67 In the alternative, mother maintains that we should reverse the termination judgment because the Department failed to make intensive, ongoing efforts to identify relative placement options. To aid the juvenile court in determining whether there is a less drastic alternative to termination, a department must evaluate a reasonable number of people as potential placement options. *D.B-J.*, 89 P.3d at 532. The record shows that the Department evaluated maternal grandmother and maternal aunt for placement. And mother has not identified any other relatives that were

available for placement (and willing to accept an APR) but not investigated by the Department. We therefore discern no error.

## IV. Disposition

¶ 68 The judgment is affirmed.

JUDGE FREYRE and JUDGE BROWN concur.